Filed 5/12/22  In re M.C. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br>v.<br>Darlene N.,<br><br>Defendant and Appellant. | A163881<br><br>(City and County of San Francisco Super. Ct. No. JD21-3126) |

Appellant Darlene N. (Mother) appeals from a dispositional order declaring her young daughter, M.C., a dependent minor and placing her in Mother's home with family maintenance services.  She contends that although her toddler had been hospitalized for two days after possibly ingesting drugs, there was insufficient evidence that the minor was at substantial risk of future harm.  We conclude that the juvenile court properly assumed jurisdiction, because there was substantial evidence that the minor had suffered serious harm as a result of Mother's failure or inability to

1

adequately supervise or protect the minor.  (Welf. & Inst. Code, § 300, subd. (b)(1).)[1]  We therefore affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Mother has been diagnosed with post-traumatic stress disorder and bipolar disorder, and she reports a history of schizoaffective disorder.  She also has struggled with addiction to methamphetamine, but she reports that she has been sober since 2016 after participating in an 18-month rehabilitation program.

These proceedings started after then two-year-old M.C. was hospitalized for two days in May 2021.[2]  According to Mother, she woke up late and had breakfast around 11:00 a.m., and the minor's father left the home around 12:30 p.m.  The minor took a nap in Mother's bedroom around 1:30 p.m. and woke up at 3:10 p.m.  Mother put on cartoons for the minor to watch, but the minor was not interested and left to play with toys in the living room.  Mother stayed in her room to rest since she had recently torn a leg ligament.  But around five minutes later, she realized she did not hear the minor making noise and went into the living room.  Mother found the minor limp and unresponsive in a toy electric car.  She called 911 and was taken with the minor by ambulance to the hospital.  The minor had hypothermia and poor respiratory drive, symptoms that were consistent with ingestion of drugs.  She was administered fentanyl in order to intubate her.

Mother was not sure what happened to cause the minor to lose consciousness, and the cause has never been conclusively established.

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] All further date references are to the 2021 calendar year.

2

Mother told an investigator that the minor's father used fentanyl and that the minor could have possibly been exposed to it. Mother thought the minor might have put something in her mouth, as the minor previously had swallowed a hair tie. She also said it was possible the minor slipped and hit herself on a nearby glass table when she was climbing into her toy car. But a treating doctor reported that the minor's injuries were not consistent with a concussion. This assessment upset the minor's father, who thought the minor had a concussion, and he told the doctor that Mother had "a big mouth." A CT scan and an MRI were performed at the hospital, and all images were "completely normal."

A social worker with respondent San Francisco Human Services Agency (Agency) was called to the hospital two days after the minor was admitted and met with Mother and her daughter. Mother presented as alert and sober, and the minor was "fully alert" and playing with a toy in a hospital crib. The minor did not have any observable bruises, but the social worker noticed she had a dime-sized "red circular mark" on the right side of her face. Mother and the social worker discussed a safety plan. They agreed that the minor would stay with a maternal aunt in Santa Rosa for a week, that Mother would drug test with the Agency, and that the aunt would inform the Agency if Mother left with the minor. The minor was discharged to stay with the maternal aunt, where she adjusted well.

From the beginning of the Agency's involvement with the family, social workers had difficulty engaging with, and sometimes even contacting, the minor's father, who is not a party to this appeal. According to Mother, the father's preferred drug was heroin, but he switched to fentanyl when it became hard during the COVID-19 lockdown to obtain what he wanted. When a social worker was able to speak with the father, he acknowledged

3

that he had experienced domestic violence with his previous partner but denied any domestic violence with Mother. He also denied any drug use other than marijuana. But he never presented himself to the Agency for an assessment. The father was not present at the combined jurisdiction/disposition hearing that is the subject of this appeal.

Toward the end of the week that the minor was scheduled to stay with the maternal aunt, Mother became concerned about whether she would be able to reunite on schedule, even if drug-test results were not yet available as contemplated by her safety plan. Mother became "reactivated," elevated her voice, and started talking in an accelerated manner when the social worker asked that she remain patient and work with the Agency. The next day, Mother had a visit with the minor in a Santa Rosa park and left with her daughter after accusing her sister of harming the minor. The minor was crying loudly but Mother did not pay attention to her distress as they left the park.

The Agency held a meeting over Zoom the following day. Mother participated, along with two maternal aunts (the one who had taken the minor for a week and another aunt) and one of Mother's friends. Mother said she had not meant to overreact when she met in the park but that she found her sister's communication style "very triggering." She showed that the minor was fine, and at the time of the meeting the minor could be seen in a highchair eating a snack. Mother agreed to continue working with the Agency.

Mother's toxicology report came back around this time, and it showed she was positive for marijuana and negative for other substances. The minor's report showed she had been positive for fentanyl and another

medication. Since fentanyl and the other drug had been used to intubate the minor, it could not be determined how fentanyl entered her system.

The Agency was concerned about the father's unaddressed substance abuse and considered the minor at "high risk of abuse and/or neglect" should the minor be in his care. The Agency thus recommended that the minor remain in Mother's care and detained from the father.

A dependency petition was filed in early June under section 300, subdivisions (b)(1) (failure to protect) and (g)(1) (no provision for support, which was alleged only as for the father). The minor was ordered detained from father only, and placed with Mother.

The Agency reported in a July jurisdiction/disposition report that Mother appeared to be addressing the minor's needs. Mother had been assigned to a therapist and had had three sessions, and she also had been prescribed psychotropic medication. She took the minor to her pediatrician, who said that it was "very plausible" the minor had suffered a concussion in May, but the doctor could not assess for concussive symptoms given the minor's age.

A social worker went to Mother's home in September for a scheduled meeting but Mother would not allow him inside the residence. Instead, Mother brought the minor to the courtyard of the building and said they could meet there. She continued to refuse access to her home even after the social worker told her the home needed to be evaluated. Mother told the social worker that the father no longer lived in the home and that although she spoke to him daily, she had no in-person contact with him. She refused, however, to provide the father's contact information, saying that the Agency already had it, and she also refused to sign a release of information. Mother did interact appropriately with the minor. During their talk the social

worker learned that Mother was taping their conversation on her phone and asked her to stop. Mother said the interview was over and demanded that the social worker leave the premises.

A different social worker found that when she spoke on the phone with Mother, it generally took a while for the worker to calm Mother down and "deescalate" her because she was crying or speaking quickly and saying she was anxious. But every time the social worker met in person with Mother and the minor, Mother acted appropriately.

Mother's therapist reported that Mother continued to attend therapy as of early October but missed about one session each month. Mother had been inconsistent about submitting to random drug testing, and it was unclear whether she was consistently taking psychotropic medication as recommended. The minor had been evaluated and was eligible for speech therapy and applied-behavioral-analysis therapy. It was possible the minor has autism, and further assessment was scheduled. Mother stated she was no longer in a relationship with the father, but the Agency stated it was unable to verify this since social workers were not able to contact him.

A contested jurisdiction/disposition hearing was held in late October. When asked whether she had any concerns about Mother's ability to access services for the minor, a social worker testified that she "had to push her [Mother] a lot to complete the intake" for the minor to receive services. The social worker also testified that Mother "might struggle to set boundaries" with the father with respect to the minor. The social worker felt it was important to have a family-maintenance case because "the mom needs additional support to get her mental health consistent, her taking her medicine consistently, making sure that [the minor] is making it to all her providers' appointments, and just making sure that she is being cared for in a

6

safe, loving home away from drugs." The social worker acknowledged on cross-examination that although she had concerns about Mother, they did not rise to the level of seeking to remove the minor from Mother's care.

The juvenile court concluded that "I think there does need to be some supervision at this time based on the totality of all the evidence I have before me." The court agreed that it was a "close call" but had "enough concerns that I am going to sustain the allegations and find that the concerns I have are active and current, not speculative." The court sustained allegations under section 300, subdivision (b)(1), that the minor was at risk of serious physical harm from Mother based on (1) the possible ingestion of fentanyl that led to her hospitalization, (2) the bright red circular mark observed on her face, (3) substantiated allegations of child abuse based on general neglect, and (4) Mother's mental-health issues that require assessment and treatment. As for the father, the court sustained allegations under section 300, subdivision (b), that he had substance-abuse issues and had been uncooperative with the Agency, and it sustained an allegation under section 300, subdivision (g), that he had been uncooperative in the Agency's investigation and his whereabouts were unknown. The court adjudged M.C. a dependent minor, to remain in Mother's home, and ordered family maintenance services for Mother but not the father.

## II.
## DISCUSSION

Mother argues that there was insufficient evidence to sustain jurisdiction under section 300, subdivision (b)(1), because at the time of the jurisdiction/disposition hearing there was no substantial risk of serious physical harm to the minor. We agree with the juvenile court that this is a close case but ultimately conclude that there was sufficient evidence to support the jurisdictional findings.

"In reviewing the sufficiency of the evidence on appeal we consider the entire record to determine whether substantial evidence supports the court's findings.  [Citation.]  We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding."  (*In re James R.* (2009) 176 Cal.App.4th 129, 134–135.)

A juvenile court may take jurisdiction of a minor where the social-services agency proves by a preponderance of the evidence (§ 355, subd. (a)) that "[t]he child *has suffered*, or there is a substantial risk that the child will suffer, *serious physical harm* or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."  (§ 300, subd. (b)(1), italics added.)  The subdivision is phrased in the disjunctive (whether minor has suffered *or* is at substantial risk of suffering serious harm), which "demonstrates that a showing of prior abuse and harm is sufficient, standing alone, to establish dependency jurisdiction."  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435, fn. omitted.)

Although the cause of the minor's hospitalization was never conclusively established, there was sufficient evidence that she "ha[d] suffered . . . serious physical harm . . . as the result of the failure or inability of [Mother] . . . to adequately supervise or protect [her]."  (§ 300, subd. (b)(1).)  There was concern that the father had brought drugs into the home, and the minor's symptoms were consistent with the ingestion of drugs, which led to her being hospitalized for two days.  Mother stresses that the hospitalization

8

was the result of an accident and not negligence. But the Agency was not required to establish that Mother was "at fault or blameworthy" or that she created the danger to the minor: "[A] parent's conduct—short of actually creating the danger a child faces—may still satisfy the standard required under the . . . clause[s] of section 300 (b)(1)" that do not refer to the "willful or negligent failure" of a parent. (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

Mother also focuses on whether, at the time of the jurisdictional hearing, the minor faced a current "substantial risk" of serious physical harm (§ 300, subd. (b)(1)). True, the juvenile court's jurisdiction can continue "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness" (§ 300, subd. (b)(1)), suggesting the juvenile court must evaluate the risk to a child at the time of the hearing in order to take jurisdiction of a minor. As mother points out, some cases have held or suggested that a single past incident resulting in physical harm to a minor may be insufficient to demonstrate "a substantial risk of *future* serious physical harm," determined at the time of the jurisdiction hearing. (E.g., *In re J.N.* (2010) 181 Cal.App.4th 1010, 1023.) But those cases tend to rely on *In re Rocco M.* (1991) 1 Cal.App.4th 814, which involved previous version of section 300, subdivision (b), that specifically required current unfitness of a parental home. (See *In re J.K., supra,* 174 Cal.App.4th at pp. 1435–1436; see also *In re R.T., supra,* 3 Cal.5th at p. 629 [*Rocco M.* "went astray" by suggesting a parent's failure to supervise or protect must always amount to negligence to satisfy § 300, subd. (b)(1)]; Seiser & Kumli on Cal. Juvenile Courts Practice and Procedure (2021 ed.), Subject Matter and Dependency Jurisdiction, § 2.84[3], pp. 2-313 to 2-314.) We see no reason to depart from a plain reading of the current version of the statute.

In any event, given the totality of the circumstances here, we cannot say the juvenile court's finding that there was a current risk to the minor was unreasonable or lacked sufficient evidentiary support in the record. As the juvenile court observed, "there was some sort of neglect here that was serious enough to have to intubate a child. And that's as much the father's responsibility as it is the mother's responsibility." Given the seriousness of the hospitalization, mother's struggles with addiction and mental health, and the unclear role that that father plays in the family's life, substantial evidence supports the jurisdictional finding related to the minor's hospitalization. In light of our conclusion, it is unnecessary to address Mother's arguments that the allegations regarding her mental health were an insufficient basis for jurisdiction. (*In re I.J.* (2013) 56 Cal.4th 766, 773 [where dependency petition alleges multiple grounds for asserting jurisdiction, reviewing court can affirm jurisdictional finding if any one of the bases for jurisdiction is supported by the evidence].)

We agree with Mother that there was evidence that she acted appropriately with the minor and was able to meet her daughter's needs. It is undisputed that Mother has taken commendable steps, and the universal hope is that family maintenance services will benefit the family without the need for more serious intervention.

III.
DISPOSITION

The juvenile court's order is affirmed.

10

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.




_____

Wiss, J.*




*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*In re M.C.*  A163881


11